**Electronically Filed
Intermediate Court of Appeals
CAAP-12-0000869
17-SEP-2015
01:06 PM**

NO. CAAP-12-0000869

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
MAKUOLA KEALIIKEKAI COLLINS, also known as Maku,
Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 11-1-0077)

MEMORANDUM OPINION
(By: Nakamura, Chief Judge, and Foley and Fujise, JJ.)

Plaintiff-Appellee State of Hawai'i (State) charged Defendant-Appellant Makuola Kealiikekahi Collins (Collins), also known as "Maku," with: attempted first-degree murder for attempting to cause the deaths of more than one person, namely, Joel Botelho (Joel) and Leon Botelho (Leon), in the same or separate incident (Count 1); attempted second-degree murder of Leon (Count 2); second-degree murder of Joel (Count 3); carrying or use of a firearm in the commission of a separate felony (Counts 4 and 5); place to keep a firearm (Count 6); third-degree promoting a dangerous drug for possession of methamphetamine (Count 7); and unlawful use of drug paraphernalia (Count 8).

Collins and Joel grew up together, and they were friends, classmates, and teammates on their high school football team. Leon was Joel's younger brother and also knew Collins. The murder, attempted murder, and firearms charges in this case

stemmed from an incident that began at a bar, where Leon without warning punched Collins in the face, and ended in the street outside the Botelhos' family home.

With respect to Counts 1 through 6, the jury found Collins not guilty of Count 1 and guilty as charged of Counts 2 through 6. Collins pleaded no contest to Counts 7 and 8, the drug-related counts. The Circuit Court of the First Circuit (Circuit Court)[1] sentenced Collins to life with the possibility of parole and a mandatory minimum term of fifteen years of imprisonment as to Counts 2 and 3; twenty years of imprisonment as to Counts 4 and 5; ten years of imprisonment as to Count 6; and five years of imprisonment as to Counts 7 and 8. The Circuit Court imposed the sentences on Counts 2, 3, 4, and 5 to run concurrently with each other. It imposed the sentences on Counts 6, 7, and 8 to run concurrently with each other, but consecutive to the sentences on Counts 2, 3, 4, and 5.

On appeal, Collins argues that: (1) the Circuit Court erred by not striking the medical examiner's expert opinion that Joel was on his knees when he was shot, as a sanction for the State's violation of its discovery obligations in failing to disclose the medical examiner's opinion on this issue; (2) with respect to the murder and attempted murder charges, the Circuit Court plainly erred in failing to *sua sponte* instruct the jury on the affirmative mitigating defense of extreme mental or emotional disturbance; and (3) the Circuit Court erred in dismissing Collins' "Motion to Set Aside Verdicts and For New Trial" (Motion for New Trial) for lack of jurisdiction.

As explained below, we conclude that the State violated its discovery obligations by failing to disclose the medical examiner's expert opinion relating to Joel being in a kneeling position when he was shot. We further conclude that under the circumstances of this case, the State's violation of its discovery obligations was particularly harmful to Collins'

---

[1] The Honorable Karen S.S. Ahn presided.

defense and resulted in substantial prejudice to Collins. We therefore vacate Collins' convictions on Counts 2 through 6 and remand the case for a new trial on these counts.

BACKGROUND

I.

The following underlying facts are not disputed by the parties. Collins, whose nickname is "Maku," and Joel were friends. They graduated together in 2002 from Castle High School, were teammates on the Castle High School football team, and their families lived a short distance from each other. Joel's brother, Leon, who was several years younger than Joel, also knew Collins. Leon's relationship with Collins, however, was strained because Kayla, Leon's ex-girlfriend and the mother of his child, had been "cruising" with Collins for a period of time after she broke up with Leon.

After graduating from high school, Joel moved from O'ahu to the Big Island. On January 1 , 2011, Joel was back on O'ahu to spend time with his family and to celebrate his birthday, which was on January 1. From the afternoon on January 1, Joel and Leon had been eating and drinking at their house with friends. At about 2:00 a.m. on January 2, Joel and Leon, along with several friends, went to a nearby bar, Club Komo Mai.

At Club Komo Mai, Joel and Leon were sitting in a booth, when Collins walked up to them. Collins and Joel had not seen each other for several years. Collins greeted Joel warmly, hugged him, and they had a friendly conversation. Collins also greeted Leon, and they hugged. However, without warning, Leon punched Collins in the face. Bouncers at the bar intervened, and Leon was escorted out of the bar. Leon and Joel left the bar, with Joel driving Leon's car, a Jeep Cherokee (Jeep). Collins also left the bar along with his girlfriend, Chevante, Chevante's sister, Lanchelle, and Lanchelle's boyfriend, Bernard.

Collins called his brother, Bucksand, and his cousin, Antone, and they all met at Collins' house. Antone also brought his girlfriend, Kailani, and their infant son. While the group

3

was at Collins' house, they saw Leon and Joel drive by, apparently headed to the Botelhos' home. The Collins group decided to follow Leon and Joel.

Joel parked the Jeep near his family home. Leon got out of the Jeep and grabbed an unregistered rifle he had hidden under a shed. The Collins group parked their cars up the street, a distance away from the Botelhos' house, and all the males -- Collins, Bucksand, Antone, and Bernard -- got out of the cars. It was very dark. Three shots were fired, one of which was from Leon's rifle. A bullet struck Joel on the left side of his chest and traveled at an acute downward angle before lodging adjacent to his spine on the right side of the lower back. This bullet killed Joel. The fatal bullet was not shot from Leon's rifle, but could have been fired from various handguns. After Joel was shot, the Collins group left the scene. The police recovered Leon's rifle at the scene but did not recover a handgun.

## II.

During closing arguments, the parties expressed their differing views on what had happened and what the evidence had shown. The Deputy Prosecuting Attorney (DPA) argued that Collins went to the Botelhos' house to seek revenge because Collins was angry and upset that Leon had "false-cracked" him at the bar. The DPA suggested that when Collins heard Leon shoot the rifle into the ground, Collins assumed that Leon had shot one of the people in Collins' group. Collins then reacted by pointing the gun at Joel and shooting him in the chest. When Leon ran over to see what had happened, Collins fired a shot at Leon, but missed.

Collins' counsel argued that Collins did not fire a gun at anyone. Collins' counsel suggested that in addition to the rifle, Leon also had a hangun, and that Leon was out of control, as shown by his blind-side attack on Collins at the bar. Defense counsel argued that in an attempt to shoot Collins, Leon missed and accidentally shot his brother, Joel. Defense counsel also asserted that the statements that Leon gave to the police were inconsistent with his trial testimony and filled with lies.

4

III.

The State presented the following relevant evidence in its case in chief.

A.

Leon testified that while he and Joel were sitting in a booth at Club Komo Mai, Collins came over. Collins and Joel greeted each other and were "smiling." While Joel appeared happy to see Collins, Leon felt "tension" because of Collins' prior relationship with Leon's ex-girlfriend, Kayla, who was the mother of Leon's child. After Leon and Kayla broke up in 2010, Leon believed that Kayla had some sort of involvement with Collins. Collins greeted Leon, and they shook hands and hugged.

According to Leon, he indicated to Collins that he was over Kayla and had no hard feelings toward Collins. However, Collins told Leon, "[N]o, let's take it outside," which meant to Leon that Collins wanted to fight. Leon initially declined and told Collins that he and Joel were there to celebrate Joel's birthday. But then Leon decided to take "[his] odds, and [he] used it against [Collins]. And [he] punched [Collins] first." When Collins looked away, Leon punched him in the face. The bouncers at the bar grabbed Leon and escorted him out. Joel was upset and "pissed off" at Leon for punching Collins, and Joel was yelling at Leon as Joel drove Leon's Jeep away from the bar.

Joel and Leon subsequently returned to the bar to retrieve a phone that Leon had left behind, and then they headed home. They had to pass Collins' house to get home. As Joel and Leon passed the Collins' house, they saw Collins standing outside with a group of people. Leon heard Collins swear, saw the Collins' group "scrambling towards their car[s]," and then saw "headlights coming on from their direction."

After Joel parked the Jeep and while Joel and Leon were walking toward their home, Leon saw Collins' car turn down the lane to Leon's home accompanied by other cars. Leon grabbed his rifle, which he had hidden under a shed, and loaded it with one round. Leon told Joel to get into Leon's Jeep and follow Leon.

5

As Leon ran on foot up the lane towards Collins' car, Joel followed behind in the Jeep and eventually parked in a grassy area. Leon saw some people walking towards him. Leon saw a man in a red shirt, later identified as Bernard from Collins' group, in the grassy area where Joel eventually parked. Leon ran up to Bernard, told him to "beat it," and hit Bernard in the head with the "back end" of the rifle. Leon then saw Antone in the middle of the road, told Antone to leave, and hit Antone with the rifle.

After hitting Antone, Leon noticed someone standing at the back end of his Jeep. Leon believed his brother was by the Jeep. Leon fired a round from his rifle into the ground to scare the Collins group away. Leon then saw a flash and heard the boom of a gunshot. The person who fired the shot was standing at the back of Leon's Jeep. Leon ran towards this person, saw that it was Collins, and called him a "fucking faggot." As Collins ran away from Leon, Collins fired a shot at Leon from a distance of about twenty feet, which missed Leon.

Leon looked for his brother but could not find him. Leon ran home, saw his father outside, and told him to get back into the house. Leon ran back to his Jeep to look for his brother, and he "dumped" his rifle in a grassy area -- he was afraid of being caught with the gun by the police. Leon got into the Jeep, reversed out, and then saw his brother lying down in the doorway of a house. Leon went to his brother, saw a hole in his chest and noticed he was breathing hard, and ran for help.

B.

On cross-examination, defense counsel impeached Leon's trial testimony with various prior statements he had made regarding the incident. Leon admitted that when the police first arrived at the scene, he did not tell them about his possession and use of the rifle. The rifle was an assault rifle and was not a "legal registered firearm." Leon admitted that he lied about the rifle because he wanted to protect himself from getting in trouble.[2]

---

[2] Leon admitted that he was "pretty jealous" regarding his ex-girlfriend, Kayla, and that he could lose his temper when he gets jealous.

Leon answered yes when defense counsel asked if he had "testified in court today that you clearly saw [Collins] holding a gun, pointing in the direction where you believed your brother to be, and shooting." Leon also agreed with defense counsel that Leon testified that it was "just clear in [his] mind" that he could "see [Collins] pointing that gun and essentially executing [Joel]." However, Leon admitted that in his interview at the police station with Detective Deena Thoemmes (Detective Thoemmes) two hours after the incident on January 2, he did not say he saw Collins pointing a gun where he believed his brother was and firing. In his first statement to Detective Thoemmes, which was recorded, Leon said he was scuffling with Antone, he heard shots, he ran to the Jeep to look for his brother, at which point, Collins fired a shot at Leon. Leon acknowledged that he lied to Detective Thoemmes about what had happened at the bar, that he did not mention the rifle, and that his first statement to the detective was "very inaccurate."

Leon gave a second recorded interview to Detective Thoemmes a couple hours after the first recorded interview. By this time, Leon knew the police had recovered the rifle. He also knew the police had tested his hands, and he believed they would find gunshot residue. Leon still lied about the rifle, telling Detective Thoemmes that Bernard, the first person he had encountered, had the rifle and fired it while Leon was scuffing with Antone. Leon said that he was then able to wrestle the rifle away from Bernard. Leon told Detective Thoemmes that right after the rifle shot, he heard another gunshot, which he thought was "probably the one that got [his] brother." Leon's statement to Detective Thoemmes regarding the timing of when Collins shot at him was different from what he testified at trial. In the version he told Detective Thoemmes, he ran to the Jeep, then went to talk to his father, then ran back to the Jeep, at which time Collins shot at him.

Defense counsel also impeached Leon's trial testimony with Leon's testimony at the preliminary hearing. At trial, Leon testified that there were three shots: Leon shooting his rifle,

followed by Collins firing a gun standing at the back of the Jeep, and Collins firing a shot at Leon when Leon ran to the Jeep. At the preliminary hearing, Leon testified that there were five shots: (1) a gunshot by the Jeep; (2) Leon then shot his rifle; (3) a second shot by the Jeep; (4) Collins shooting at Leon as Leon was running toward the Jeep; and (5) Collins shooting at Leon after Leon had arrived at the Jeep. At trial, Leon testified that Collins was running away from Leon when Collins shot at Leon; at the preliminary hearing, Leon testified that Collins took a shot at Leon while running away from Leon and then took another shot at Leon while running back toward Leon.

C.

Thomas Perri (Perri), who lived near the Botelhos, had security cameras mounted around his house. One of the cameras, which constantly recorded in both audio and video, was recording during the early morning incident that occurred on January 2, 2011 at about 3:00 a.m. The video appeared as a blank screen because it was dark, but sounds were captured in real time.

The State introduced State's Exhibit 51, the audio of the security recording which had been enhanced, and it was played for the jury. In his opening brief, Collins describes the recording as follows: "About two minutes in, a loud bang like a gunshot is heard. About six seconds later, a second gunshot sound is heard. About seven seconds after that, a third gunshot sound is heard. The time between the first and third shots is approximately thirteen seconds."[3]

---

[3] We note that in response to our request to the Circuit Court to physically transmit State's Exhibit 51 to this court, the Circuit Court clerk reported that State's Exhibit 51 was missing and could not be located. The State, in its answering brief, does not controvert Collins' description of the security recording. Collins' description is also consistent with the representations of both counsel at trial. In opening statement, the DPA referred to the security recording as revealing "[t]hree loud bangs" and a first gunshot followed "seconds later" by a second gunshot. In closing argument, the DPA also indicated that the second and third shots were "about seven seconds apart." Collins' counsel, in closing argument, stated that the security recording showed that there was about thirteen seconds between the first shot and the third shot. For purposes of this appeal, we will rely on Collins' description of the security recording as set forth in his opening brief.

8

D.

Marilyn Keohokalole (Keohokalole), a retired registered nurse, lived close to the Botelhos. According to Keohokalole, in the early morning between about 2:00 and 3:00 on January 2, 2011, she was sleeping in her bedroom when she was awakened by "cars, and yelling, and screeching tires." She heard between four and six gunshots. She looked out her bedroom window, closed the window, and went to the bathroom to look out, but it was too dark to see. She went back into the bedroom, woke up her husband, and walked down the hall, and either she or her sister-in-law woke up her son. Keohokalole then went to use the bathroom, and while there, she heard a "lot of voices yelling and screaming" and the sounds of people running through the yard.

Keohokalole testified that she then heard another gunshot or two and male voices arguing. She did not recognize those voices at the time. Keohokalole testified that the male voices were muffled; she could tell by the tone of their voices that they were arguing, but she could not "really recall" what was being said beyond that there was some swearing. The DPA attempted to refresh Keohokalole's recollection with the transcript of an interview she gave to the police on January 7, 2011, five days after the incident.[4] After reading a portion of the transcript, Keohokalole testified that there were some things she remembered and some things she did not.

With respect to what she remembered, Keohokalole testified:

> I remember the -- I remember who I assume to be Joel getting out of the truck. I remember him trying to reason with the other guy that had -- apparently had a gun. And they were talking about -- Joel was trying to talk to him about that they were -- had been friends in high school. And that they had either played football together, or tried out for football together. And that they knew each other. And the other man didn't seem to recall, or didn't want to recall.

-----

[4] Keohokalole also gave a statement to the police in the morning on January 2, 2011.

And eventually -- eventually, he asked about Bubba.[5]  And Joel said he's not here.  I'm here for him. And then at some point, he told Joel to get down on his knees.  And then I didn't hear any voices.  And then there was a shot.  And I don't know who fired the shot or where it came from.  But -- but he shot Joel.

Keohokalole testified that she recalled that Joel may have told the other man to put the gun down; that there was a long silence; and that she believed there may have been another shot after the one she just described, but could not remember when this other shot happened.  She heard a woman screaming "he shot him, he shot him," a lot of crying and screaming, footsteps running and getting into a car, and cars turning around and driving away.

On cross-examination, Keohokalole acknowledged that she had trouble remembering a lot of things even after reading her interview statement, that she told the police that she had trouble with her memory, and that she was forgetful at times. Keohokalole admitted that she could not see anything that night and did not recognize any of the voices, but that she used names such as Joel, Bubba, and Collins in talking to the police to fit the names to whom she assumed the people were.  She stated that she told the police that the conversation she heard between the two males seemed like twenty minutes, but the conversation was probably something like two or three minutes.  The conversation she heard "was not a ten-second little conversation," but involved a give and take between the two individuals and also gaps of silence during the conversation, including a period of silence before the gunshot.  She told the police that a third person with an "older voice" joined in the conversation.

Keohokalole further testified on cross-examination that she recalled voices yelling out to whom she believed were Joel and Bubba and asking if they needed a rifle and others who sounded like residents threatening to shoot.

---

[5] Leon's nickname is "Bubba."

E.

The State called the former Chief Medical Examiner of the City and County of Honolulu, Kanthi DeAlwis (Dr. DeAlwis). Dr. DeAlwis was qualified as an expert in the field of forensic pathology "to render opinions as to the cause of death of a person." Dr. DeAlwis had performed the autopsy on Joel's body. Dr. DeAlwis testified that Joel suffered a gunshot wound, which she described as a "distant wound," meaning that the gun was fired from beyond 18 inches to 2 feet.[5] She could not say whether the gun was fired from 3 feet, six feet, or beyond. The bullet entered on the left front side of Joel's chest, about two inches below the left nipple and three and a half inches from the midline, traveled at a very acute downward angle, and lodged adjacent to his spine on the right side of the lower back. Dr. DeAlwis opined that Joel bled to death from injuries to his internal organs resulting from the gunshot.

On direct examination, Dr. DeAlwis opined that the injuries suffered by Joel were consistent with Joel having been on his knees when he was shot. On questioning by defense counsel, Dr. DeAlwis testified that her opinion regarding the scenario of Joel being on his knees when he was shot was to a reasonable degree of medical probability. At the conclusion of Dr. DeAlwis' testimony, defense counsel moved to strike her opinion testimony regarding Joel being on his knees when he was shot because the State had not disclosed this opinion in discovery. The Circuit Court denied the motion.

F.

Bruno Heldt (Heldt) lived near the Botelhos and next to Perri. At about 2:00 or 3:00 in the morning on January 2, 2011, he was awakened by some loud pops in the neighborhood. Heldt went outside to his patio and saw two cars and at least two people on the road. Heldt testified that he heard someone

---

[5] Dr. DeAlwis's opinion that Joel was not shot at very close range was based on her examination of the area surrounding the entry wound and her understanding that he had not been wearing a shirt when he was shot.

saying, "Moku, drop the gun."[1] After being shown the statement he gave to the police on January 2, 2011, Heldt testified that he heard, "Moku, hide the gun." On cross-examination, Heldt testified that he never "heard the word Maku anywhere," but upon further questioning by defense counsel, Heldt indicated that he maybe recalled someone screaming "Maku, let's fucking go."

G.

Daniel Stone (Stone) lived near the Botelhos. On January 2, 2011, at around 3:00 a.m., Stone was awakened by a loud noise and then heard two or three more loud noises that sounded like gunshots. The time between the first and second loud noises "was pretty quick." He looked out the window and saw two cars. Stone heard a male yelling from one of the two cars, "[G]et rid of it. Get rid of the gun." He then heard something that sounded like a weapon hitting the ground. From the area of the two cars, Stone heard a male yelling, "Why you gotta go do that for?" and later from a different area, "Dad, he's down." He also heard, "Get out of here. Just go. Get out of here."

H.

Detective Thoemmes, the lead detective in the investigation, testified that Leon identified Collins as the shooter. Detective Thoemmes stated that Leon lied and withheld information when providing statements to her, including failing to tell her about his having a rifle. As far as she knew, no charges had been brought against Leon.

Detective Thoemmes testified that when the police arrived at the scene, Officer Doreen Teramae (Officer Teramae) spoke with Leon. According to Officer Teramae's police report, Leon told Officer Teramae that Collins shot at Leon and missed, and that was how Joel got hit. In her report, Officer Teramae never wrote that Leon said he saw Collins shoot Joel or shoot in the direction of Joel.

---

[1] As noted, Collins' nickname is "Maku" apparently from his first name "Makuola."

12

Criminalist Cindee Lorenzo testified that the bullet that killed Joel was consistent with being a caliber .38 class jacketed bullet, and that this type of bullet could be fired by various handguns. She testified that Leon's rifle could not have fired the bullet that killed Joel. The State also introduced photographs of Joel's body, which showed blood in the area around his knees.

The police performed gunshot residue tests on various individuals and items seized by the police, including Collins and clothing seized from Collins's residence. The only test that came back positive for gunshot residue was the test done on Leon's hands.

IV.

A.

Collins testified in his own defense at trial. Collins testified that he was a "good friend" of Joel. Collins went to school with Joel in the same grade from elementary school through high school, and they played baseball and basketball together in youth sports leagues. They were also teammates for four years on the Castle High School junior varsity and varsity football teams. In their senior year, Collins was one of the defensive captains and Joel was one of the offensive captains of the football team.

On the night of January 1, 2011, Collins went out with a group of friends that included his girlfriend, Chevante, Chevante's sister, Lanchelle, and Lanchelle's boyfriend, Bernard. They eventually ended up at Club Komo Mai. When Collins went to use the bathroom, he noticed Joel and Leon sitting in a booth. Collins greeted Joel, whom he had not seen for several years. They shook hands and reminisced about "the good old days." When Joel went to the bar, Leon asked to speak to Collins.

According to Collins, Leon asked if Collins had been taking out Leon's ex-girlfriend, Kayla. Collins admitted the he had taken Kayla out a couple of times, but explained that she was single and that he was not the only one she was seeing. Leon

13

said that he appreciated Collins being honest. Leon told Collins that "everything's all good" and they hugged each other. However, when Collins turned, Leon without warning punched Collins in the face. Collins was dazed. He received three more punches to his throat, he grabbed Leon, and they both fell to the floor before being separated by bouncers. Collins had recently undergone a hernia surgery and the stitches had not yet been removed, and therefore, he could not fight.

Collins left Club Komo Mai with Chevante, Lanchelle, and Bernard. Collins called his brother, Bucksand, and his cousin, Antone, and they all met at Collins' house. Collins was mad about being punched without warning by Leon, but Bucksand and Antone told him to relax and settle the matter the next day during the daytime. As they were talking, Leon's car drove by and Leon leaned out the passenger window and yelled, "Fuck you, you fucking faggots, let's go." Collins decided to settle the matter "right now," not by fighting, but by talking to Joel and telling Joel to control his brother. Collins explained he had been allowing Leon to get away with all kinds of things because he loved and respected Joel. This included an incident a couple of years ago between Leon and Collins' family where Collins' family did not press charges against Leon. Due to his hernia stitches, Collins could not fight, but Collins believed he would be safe if accompanied by his relatives.

It was a two to three minute drive from Collins' house to the Botelhos' residence. The Collins group took two cars: Collins, Bernard, Lanchelle, and Chevante were in Collins' car and Antone, Bucksand, Antone's girlfriend, Kailani, and their young child were in Antone's car.

When they arrived at the lane leading to the Botelhos' house, both cars made U-turns and faced toward the main road. Everyone but Kailani and the young child got out. It was pitch black, and Collins had difficulty seeing.

As Collins was walking down the lane towards the Botelhos' house, he heard the sound of footsteps rapidly

14

approaching and then a car drive full speed toward the Collins group. Collins jumped to his right to evade the oncoming car, which veered to his left and stopped. Just before jumping to the right and falling to the ground, Collins heard a loud bang coming from behind the car. As he was on the ground, Collins heard a loud noise and saw a flash, which he believed was a gunshot, come from his right about ten to fifteen feet away. Collins started backpedaling away from the loud noise and flash "towards the vehicle," and he saw a shadowy figure to his right. Although Collins could not see who the figure was, he recognized Leon's voice yelling, "Fuck you, you fuckers." Collins saw something like a hand pointing towards him and there was another loud bang and a flash directed at Collins. Collins ran back to his car and heard a lot of yelling and screaming. He put Chevante and Lanchelle in his car and told them to take off. He ran to Antone's car, got in the backseat, and they drove off.

Collins denied bringing a gun when he went to the Botelhos' residence and denied seeing anyone in his group with a gun that night. Collins testified that the only person he noticed with a gun was Leon. Collins testified that he did not shoot Joel and stated he had no reason to be mad a Joel because he did not blame Joel for the things that Leon did.

Collins was dropped off at his house. By happenstance, his ex-girlfriend, Cozylee, drove by and gave him a ride to Chevante's house. Collins did not know that Joel had been shot. Collins left Chevante's house and drove around, worried that Leon was still looking for him, before returning to Chevante's house and going to sleep. He was awakened by a phone call from Chevante's father, who told him to get out of the house because he was wanted for shooting Joel. Collins drove to his grandmother's house. He then had a friend drive him home, where he took a shower and went to sleep. When he woke up, the police were there to arrest him.

B.

Kailani, Antone's girlfriend, testified that in the early morning on January 2, 2011, she went with Antone to Collins' house. She brought their young son along because she thought the car ride would calm him down. From Collins' house, Antone drove the car and stopped by Leon's house. After Kailani heard a loud noise, Bucksand said to her that Leon was shooting and told her to call 911. After several tries, Kailani got through to 911 and told the person there was a "shooting on Waikalua." Kailani testified that she did not see Collins or anyone with her group with a gun.

C.

Eamon Gray (Gray) lived near the Botelhos. In the early morning of January 2, 2011, Gray was awakened by screams and a gunshot. He looked outside his window and saw an outline of a person who appeared to be holding a gun. He then saw two muzzle flashes and heard two pops. The person appeared to be firing in the direction from the ocean to the mountain.[9]

D.

Detective Peter Boyle (Boyle) testified that on January 2, 2011, at about 8:00 a.m., he took a brief statement from Keohokalole. Detective Boyle testified that in speaking with Keohokalole, "there was no discussion about a[n] extended conversation relating to the shooting that [Keohokalole] overheard or a description of what could sound like somebody being executed or anything like that[.]"

Detective Theodore Coons (Detective Coons) testified that on January 2, 2011, he did a walk-through of the scene with Leon. Detective Coons testified that Leon told Detective Coons that when Leon was near the Jeep, Collins fired a gun in Leon's direction twice, that Joel was behind Leon, that Leon "later

---

[9] In closing argument, defense counsel argued that Gray's testimony regarding this direction is consistent with the theory that Leon fired the shots.

turned around and he saw his brother down, and that's when his brother had apparently been shot."

## V.

The jury acquitted Collins of Count 1 and found him guilty as charged on Counts 2 through 6. The Circuit Court sentenced Collins and filed its Amended Judgment on August 21, 2012.

## DISCUSSION

### I.

Collins argues that the Circuit Court erred when it failed to strike Dr. DeAlwis's previously undisclosed expert opinion that Joel was on his knees when he was shot. As explained in greater detail below, we conclude that the State violated its discovery obligations by failing to disclose Dr. DeAlwis's expert opinion relating to Joel being in a kneeling position when he was shot. We further conclude that under the circumstances of this case, the State's discovery violation resulted in substantial prejudice to Collins. We therefore vacate Collins' convictions on Counts 2 through 6 and remand the case for a new trial on these counts.

### A.

The context in which the discovery dispute regarding Dr. DeAlwis's testimony arose was as follows.

### 1.

Keohokalole testified that she heard two male voices arguing outside her house -- one voice she assumed was Joel and the other voice, based on the content of the conversation she described, was presumably Collins. According to Keohokalole's testimony, Collins told Joel to "get down on his knees," there was a period of silence when no voices were heard, and then a gunshot. Although Keohokalole did not know who fired the shot or where it came from, she believed that this is when Collins shot Joel. Keohokalole's testimony, however, was subject to impeachment because the timing of the events she described and the several shots she heard did not match the timing of the shots

17

heard on the security recording. She also acknowledged difficulty remembering many things about the incident and having trouble with her memory.

2.

The day after Keohokalole testified, the State called the former Chief Medical Examiner, Dr. DeAlwis. Dr. DeAlwis testified that Joel was not shot at very close range, but from a distance of at least 18 inches to 2 feet; that the bullet traveled at an acute downward angle, entering on the left side of Joel's chest and lodging adjacent to his spine on the right side of his lower back; and that he bled to death because of injuries to his internal organs. At the end of the State's direct examination, the DPA referred to Keohokalole's testimony and Dr. DeAlwis opined that Joel's injuries were consistent with Joel having been on his knees when he was shot:

> [DPA] Q. Now, Doctor, there is testimony that a witness had heard this two males talking. One male telling the other to get on your knees. And that male who was told to get on his knees did comply, and did get on his knees. And that witness then heard a gunshot. Would the injury that you described, as well as found, on the body of Joel Botelho be consistent with Joel having been on his knees when he was shot?
>
> [Dr. DeAlwis] A. Yes. Because of the very acute downward angle from head to toe.

On cross-examination, defense counsel questioned Dr. DeAlwis about this opinion, including the following:

> [Defense Counsel] Q. Now, the Prosecutor asked you, said there was a witness or a hypothetical about an angle, about Joel being on his knees. That's not an exclusive opinion. I mean, it does not mean he was on his knees when he was shot. Correct?
>
> [Dr. DeAlwis] A. It's very highly consistent with that, because of that acute angle going from top to bottom.
>
> . . . .
>
> Q. Now, and the angle, you don't know the positioning of the body at the time the bullet entered the body, correct?
>
> A. That's why I said whether it's consistent with this, because of the acute angle, in the anatomical position.
>
> Q. But what I'm saying is, is the angle of a body, if somebody's leaning over, that can make a difference also, correct?

A. It can make a difference. But this was a very acute angle going downwards.

Q. So if a person is leaning over, it could still help explain some of the angle.

A. It can somewhat, yes.

On redirect examination, the DPA elicited testimony from Dr. DeAlwis that during twenty-five years, she had performed over 7,500 autopsies, including more than a thousand related to gunshot wounds. The DPA then got down on his knees and had Dr. DeAlwis use the DPA's body to demonstrate and describe the angle of Joel's bullet wound and how the gun was pointed. Dr. DeAlwis estimated the angle to be approximately 45 degrees.

On recross-examination, Dr. DeAlwis testified about how certain she was of her opinion regarding Joel being on his knees when he was shot.

[Defense counsel] Q. Okay. Thank you. Now, again, you cannot give a opinion to a scientific certainty that that is the -- that the individual was on his knees, correct?

[Dr. DeAlwis] A. It's very consistent with that given scenario.

Q. Doctor, you testify a lot in court all the time. And you're asked to give an opinion to a reasonable scientific certainty. But in this case, it is possible it could happen that way.

A. Probable.

Q. But it is not -- there are other ways it could happen, correct?

A. Probability versus possibility. Anything's possible. But in -- the body gives a lot of tales from the injuries. So having had that angle, and given that scenario, it's to a high probability, a reasonable scientific probability, as it's consistent with. That doesn't mean I can be very specific, this is exactly how it happened. But that's what the angle tells me, to a reasonable degree of medical probability. Yes.

Q. But nothing in your report -- now, when you wrote this report, you had no information about a hypothetical that somebody said he was on his knees. Correct?

A. We never include hypotheticals, even if somebody gives. That's why the report is a factual report. And if you notice, I did give the direction and the angle. So that is, when all the information comes, then that's where, as a forensic pathologist, we can assist in the witness statements, given the hypothetical scenarios.

19

3.

Immediately after Dr. DeAlwis completed her testimony, defense counsel asked for a bench conference. At the bench conference, defense counsel moved to strike Dr. DeAlwis's expert opinion testimony regarding Joel being on his knees at that time he was shot on the ground that this opinion had not been disclosed in discovery. Defense counsel argued:

> In none of the materials provided to the Defense is there any aspect of an expert -- that an expert opinion was going to be rendered that said the individual is on their knees at the time the bullet is fired. That is a critical, significant medical opinion, expert opinion, that needed to be disclosed to the Defense before she testified.

> . . . .

> . . . And there was no disclosure that this witness would be rendering a specific expert opinion that this -- that the decedent was on his knees at the time, it was probable that he was on his knees at the time he was shot. That's not -- they did not provide that. And at the very least, they should have disclosed that prior to putting the witness on, so at least we could have addressed this issue.

Defense counsel also represented that after reading Dr. DeAlwis's report, he asked her if there was anything unusual or something different in her testimony. Defense counsel was not told that Dr. DeAlwis would say that Joel was on his knees when he was shot.

The DPA argued that experts are entitled to render opinions on hypotheticals that are based on trial testimony, and therefore, after Keohokalole testified at trial, it was proper to ask Dr. DeAlwis her opinion regarding whether Joel was on his knees when he was shot. The DPA acknowledged that based on his discussions with Dr. DeAlwis, the DPA knew about a month before trial that Dr. DeAlwis would render an opinion that Joel's injuries were consistent with his being on his knees when he was shot. The DPA indicated that he was not aware that Dr. DeAlwis would render an opinion that Joel was on his knees to a reasonable degree of medical probability, which Dr. DeAlwis stated in response to questioning by the defense.

Defense counsel responded that the DPA still knew that the State's expert would be giving a specific opinion that was "explosive" but "not mentioned anywhere" and not disclosed to the defense. Defense counsel indicated that at minimum, the Circuit Court should strike the portion of Dr. DeAlwis's opinion that it was probable and there was a high probability, a reasonable degree of medical probability, and a reasonable scientific probability that Joel was on his knees when he was shot. The Circuit Court denied Collins' motion to strike Dr. DeAlwis's testimony regarding Joel being on his knees at that time he was shot, advising defense counsel that he had made his record.

B.

The State was required to disclose the information it had relating to Dr. DeAlwis's expert opinion that Joel was on his knees when he was shot. With respect to reports or statements of experts, Hawai'i Rules of Penal Procedure (HRPP) Rule 16 (b)(1)(iii) (2007) requires the prosecutor to disclose to the defense the following material and information within the prosecutor's possession or control:

> (iii) any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons[.]

Shortly after Collins was indicted, he sent a written request for discovery to the State which included a request for reports and statements of experts which are material to the preparation of the defense. HRPP Rule 16(e)(2) (2007) also imposes a continuing duty on the parties to promptly disclose, upon discovery, any additional material or information subject to disclosure under HRPP Rule 16.

Here, the record shows, and the State does not dispute, that the DPA knew about a month before trial that it was Dr. DeAlwis's expert opinion that Joel's injuries were consistent with his being on his knees when he was shot. The record also

21

shows that this opinion was a statement that the DPA intended to introduce at trial. Indeed, Dr. DeAlwis's testimony that Joel's injuries were consistent with his being on his knees when he was shot was elicited by the DPA through a specific question seeking this opinion. It is also clear that this opinion was a statement, which the defense had requested in writing, that was material to the preparation of the defense. Dr. DeAlwis's testimony at trial regarding this opinion served to bolster and corroborate Keohokalole's testimony, and Keohokalole's testimony was integral to the State's proof that Collins was the person who shot Joel. Accordingly, the State violated its discovery obligations by failing to disclose Dr. DeAlwis's opinion that Joel's injuries were consistent with Joel being on his knees when he was shot.

C.

The question then becomes whether the State's violation of its discovery obligations resulted in substantial prejudice to the defense. We conclude that it did.

"[T]he goal of pre-trial discovery in both civil and criminal cases has been to promote the fact-finding process and to eliminate the tactical advantage of surprise by either side." State v. Ahlo, 79 Hawai'i 395, 397-98, 903 P.2d 690, 702-03 (1995). In discussing the civil discovery rules, we have noted that "[e]ffective cross-examination of an expert witness requires advance preparation." Lee v. Elbaum, 77 Hawai'i 446, 454, 887 P.2d 656, 664 (App. 1993) (quoting Advisory Committee Note of 1970 to Amended Subdivision (b) of Federal Rules of Civil Procedure 26, 28 U.S.C.A. Rule 26 at 29).

1.

The only purported eyewitness to identify Collins as the person who shot Joel was Joel's brother, Leon. However, Leon was not a neutral witness and his credibility was strongly challenged by the defense. Leon was Joel's brother; Leon had instigated the dispute with Collins by "false-cracking" him at the bar; Leon had armed himself with a rifle that he did not

lawfully possess; Leon had lied to and withheld information from the police; and unlike his testimony at trial, Leon had not claimed in statements he made to the police that he saw Collins pointing a gun where he believed his brother was and firing.

Keohokalole was a key witness for the State because she was the only person besides Leon whose testimony served to identify Collins as the shooter. However, Keohokalole's testimony was also subject to impeachment. In particular, her testimony regarding the timing of when she heard the gunshots, and her description of a fairly extensive conversation between the two males outside her house before the critical shot was fired, was inconsistent with the security recording.[9]

The security recording indicated that there were three gunshots, with only approximately thirteen seconds elapsing between the first shot and third shot. Keohokalole testified that she heard more than three gunshots, with significant intervals between the gunshots. According to Keohokalole, she was awakened and heard a series of gunshots. She then looked out the bedroom and bathroom windows, woke up her husband, walked down the hall, then used the bathroom before hearing another gunshot or two and men arguing. She described the argument, which included statements by the men that served to identify them as Joel and Collins, such as they were friends in high school and had played football or tried out for football together. She heard a man, presumably Collins, tell Joel to get down on his knees, there was a period of silence, and then she heard another gunshot -- the one that presumably killed Joel. In addition to Keohokalole's testimony being inconsistent with the security recording, she admitted having problems with remembering the incident and with her memory in general.

2.

Corroboration of Keohokalole's testimony was therefore very important to the State's proof. For that same reason,

_____

[9] Keohokalole's testimony regarding the timing of the gunshots was also inconsistent with testimony provided by other witnesses at the trial.

23

evidence that would corroborate and support Keohokalole's testimony was very damaging, and therefore highly material, to the defense. Dr. DeAlwis's opinion that Joel's injuries were consistent with his being on his knees when he was shot corroborated and bolstered Keohokalole's testimony. However, because the State failed to disclose Dr. DeAlwis's opinion in discovery prior to trial, the defense did not have a fair opportunity to prepare a response to this damaging testimony. The State's compliance with its discovery obligations would have given the defense the opportunity to consider retaining its own expert and to prepare for cross-examination of Dr. DeAlwis on her opinion. Instead, as the defense argues, defense counsel "was caught flat-footed" and placed in the position of having to address Dr. DeAlwis's damaging opinion without prior notice.

3.

We are not persuaded by the State's argument that defense counsel "invited the error" because the most damaging aspects of Dr. DeAlwis's opinion testimony -- that it was to a reasonable degree of medical probability and to a high probability that Joel was on his knees when he was shot -- came in response to questioning by defense counsel. The State's failure to comply with its discovery obligations deprived defense counsel of a fair opportunity to prepare for cross-examination. Thus, to the extent that defense counsel's cross-examination regarding Dr. DeAlwis's opinion revealed additional damaging testimony, this was also attributable to the States' violation of its discovery obligations.

4.

The State specifically relied upon Dr. DeAlwis's undisclosed opinion in its closing arguments to the jury. In the State's rebuttal closing argument, the DPA stated:

> We would submit to you that Joel was on his knees, as Marilyn [Keohokalole] heard Joel being instructed to do, "Get on your knees." And the defense used the word "execute." We will use that as well. Joel was executed.

> The doctor, again -- excuse me, I jumped ahead.
> Doctor DeAlwis testified where the gunshot wound was, the
> entry again, and it was consistent with Joel being on his
> knees at the time he was shot, that's her expert opinion.
> Dr. DeAlwis, a forensic pathologist, having done autopsies
> over 7,000 times, almost half gunshot wounds, she knows her
> stuff. We submit to you that Dr. DeAlwis helped to recreate
> what happened that night.

Two notes submitted by the jury during its deliberations highlight the significance of Keohokalole's testimony and thus the importance of Dr. DeAlwis's undisclosed opinion. These communications also suggest that the jury may have had questions about Keohokalole's credibility. In its first communication, the jury stated: "We the jury would like to review all of Marilyn Keohokalole (Witness:) testimony in court and her police report statement." In the jury's last communication before reaching its verdicts, the jury stated: "Can the jury have a copy of Marilyn Keohokalole's (Witness) statement to the police, dated Jan 2nd? (Her 1st statement to the police after the shooting).[10]

The Circuit Court did not take any remedial action in response to the State's discovery violation and Collins' motion to strike. The State's violation of its discovery obligations was particularly harmful to Collins' defense. The undisclosed opinion not only served to corroborate a key witness for the State, whose testimony was subject to impeachment, but it painted Collins in a very negative light by indicating that he had deliberately "executed" his friend Joel. Under the circumstances of this case, we conclude that the State's violation of its discovery obligations resulted in substantial prejudice to Collins. We therefore vacate Collins' convictions on Counts 2 though 6.

II.

In light of our decision to vacate Counts 2 through 6 based on the State's discovery violation, we need not address

---

[10] The Circuit Court responded to both communications by informing the jury that it had received all the evidence that it may consider to decide the case.

Collins' claim that the Circuit Court plainly erred in failing to *sua sponte* instruct the jury on the affirmative mitigating defense of extreme mental or emotional disturbance (EMED) with respect to the murder and attempted murder charges. The Circuit Court should decide whether an EMED instruction is appropriate based on the evidence presented during the retrial. See State v. Adviento, 132 Hawai'i 123, 319 P.3d 1131 (2014). We also need not address Collins' claim that the Circuit Court erred in dismissing Collins' Motion for New Trial for lack of jurisdiction.

CONCLUSION

For the foregoing reasons, we vacate the Circuit Court's Amended Judgment to the extent that it entered judgment of conviction and sentence on Counts 2 through 6, and we remand the case for a new trial on those counts.

DATED: Honolulu, Hawai'i, September 17, 2015.

On the briefs:

Dwight C.H. Lum
for Defendant-Appellant

Donn Fudo
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

*Craig H. Nakamura*
Chief Judge

*Daniel R. Foley*
Associate Judge

*Alexa D.M. Fujise*
Associate Judge

26